# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JENNIFER ZYNDA, an individual,
AMANDA BALMA, an individual, KEVIN
GRIFKA, an individual, BRIAN SAYLOR,
an individual, NANCY WESSINGER, an
individual, JORDAN MILLER, an                    Case No. 2:15-cv-11449
individual, MICHELLE WITT, an individual
MAURICE & JANE SUGAR LAW CENTER                  Hon.
FOR ECONOMIC & SOCIAL JUSTICE,
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA (UAW),

       Plaintiffs,

v.

MICHAEL ZIMMER, in his official capacity
as Acting Director of the Michigan Department of
Licensing and Regulatory Affairs, and
SHARON MOFFETT-MASSEY, in her official
capacity as Director of the Unemployment
Insurance Agency,

       Defendants.

_____

| | |
|---|---|
| David M. Blanchard (P67190) | Ava Barbour (P70881) |
| Joseph X. Michaels (P79084) | Associate General Counsel |
| NACHT, ROUMEL, SALVATORE, | International Union, UAW |
| BLANCHARD & WALKER, P.C. | Attorneys for UAW only |
| Attorneys for Plaintiffs | 8000 East Jefferson Avenue |
| 101 N. Main Street, Ste. 555 | Detroit, MI 48214 |
| Ann Arbor, MI 48104 | (313) 926-5216 |
| (734) 663-7550 | |
| dblanchard@nachtlaw.com | |
| jmichaels@nachtlaw.com | |

_____

## **COMPLAINT AND JURY DEMAND**

### **I. Introduction**

1.     The administration of the Michigan unemployment insurance system by the Michigan Unemployment Insurance Agency (the "Agency") has deprived Plaintiffs, and thousands of Michigan's unemployment insurance claimants like them, of their fundamental rights under the constitution and under the Social Security Act, 42 U.S.C. § 300 *et seq*, the federal legal framework for the administration of UIA benefits.

2.     In many cases, the Agency regularly and as a matter of practice determines that eligible beneficiaries committed unemployment fraud without any factual basis and without ever having a live person make the determination. The Agency uses an automated computer program to search for discrepancies in the records of all individuals who have claimed benefits, affecting not only current beneficiaries but also subjecting previous beneficiary payments to renewed automated scrutiny and "robo-adjudication" of new fraud determinations for past benefits paid.

3.     Under the robo-adjudication system, if any discrepancy is found between the information reported by a claimant and their former employer, the system flags the claimant's file as fraudulent. Under the Agency's automated

processes, once this occurs there is often no meaningful way for a claimant to respond to the Agency's allegation of fraud.

4.     This system has resulted in countless unemployment insurance claimants being accused of fraud even though they did nothing wrong. This finding automatically results in a penalty equal to five times the benefits received (the maximum allowed under the state statute). These punitive assessments regularly total $10,000-$50,000 and sometimes more.

5.     Wrongful practices related to the Agency's determination of fraud include:

      a. Sending "fraud questionnaires" containing self-incriminating questions, without any explanation of the factual basis for the Agency's fraud allegations or any sufficient information that would provide claimants with a meaningful opportunity to respond;

      b. At times, failing to send fraud questionnaires at all and yet issuing robo-determinations of fraud without even having a basis to believe that the questionnaires were received;

      c. Robo-determinations of fraud based solely on the claimant's silence in not returning the fraud questionnaire;

3

   d.  Robo-determinations of fraud when claimants return a fraud questionnaire yet the receipt of the questionnaire is not recorded in the Agency's computer system;

   e.  Misallocating income a claimant received prior to unemployment across all 13 weeks in the fiscal quarter in which a claim is filed and thereafter issuing a robo-determination of fraud when a claimant truthfully reports no income in a benefit week;

   f.  Automatic robo-determinations of fraud based on differences between the claimant and the employer's characterization of an employment separation without any investigation into whether the discrepancy was the result of administrative error, good faith dispute, or misrepresentation by the employer;

   g.  Sending confusing and defective fraud determination notices that do not inform claimants of the factual basis of the Agency's determination of fraud and do not provide any information to allow claimants to evaluate or respond to the Agency's determination;

   h.  Automatically assessing the maximum penalty allowed by statute—five times overpayment—without any factual basis to

determine intent, and often, without human review of the computerized robo-determination;

i.  Unauthorized and warrantless seizures of tax returns and wage garnishment without any evidentiary basis or factual finding that would permit the conclusion that that fraud has occurred, depriving claimants of their property without due process of law;

j.  Using unsupported fraud determinations as a basis for indefinite payment plans with the State for which the claimant is financially unable to pay;

6.  These practices have resulted in claimants being falsely accused of intentional misrepresentation and assessed onerous financial penalties because of garden variety discrepancies between employer and employee-reported information. These unlawful practices discourage eligible beneficiaries from claiming benefits they are entitled to under the law and impose substantial burdens on organizations which regularly deal with the Agency.

7.  The individual plaintiffs herein are claimants who have been affected by these unlawful practices. Individual plaintiffs have all been wrongfully accused of fraud by the Agency's robo-adjudication system. Institutional Plaintiffs are organizations who are directly affected by the Agency's practices in violation of law and representing the interest of current and future members and clients.

8.      Plaintiffs bring claims under Section 1983 and this Court's equitable powers to enforce their rights under Section 303 of the Social Security Act, 42 U.S.C. § 503, and under the Due Process Clause and other protections of the United States Constitution.

## II. Jurisdiction

9.      Jurisdiction in this Court over the Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 is provided by 28 U.S.C. §§ 1331 and 1343(3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to this action occurred therein.

## III. Parties

### Defendants

11.      Defendant Michael Zimmer is the Acting Director of the Michigan Department of Licensing and Regulatory Affairs (LARA).

12.      Defendant Sharon Moffett-Massey is the Director of the Michigan Unemployment Insurance Agency.

13.      Each Defendant acts under color of state law and is sued in his or her official capacity for the purposes of injunctive and declaratory relief. The term "Defendants" hereafter refers to all Defendants unless otherwise indicated.

14. The Defendants have executive authority to operate the Michigan Unemployment Insurance Agency, a division of the Michigan Department of Licensing and Regulatory Affairs, pursuant to the Michigan Employment Security Act, MCL, 421.1 *et seq*.

### Plaintiffs

15. Plaintiff Amanda Balma was a Certified Nursing Assistant working at a nursing home/rehabilitation center in Okemos, Michigan and a resident of Shiawassee County. Ms. Balma applied for UI benefits, was approved without incident, and received them from March through August of 2014.

16. In November 2014, three months after she had stopped receiving benefits, Amanda received a letter from the Agency stating that she had committed intentional misrepresentation and owed the Agency over $20,000 in fines.

17. The error in Ms. Balma's case is based on her employer's mischaracterization of her separation reason, yet it was Amanda who was accused of fraud.

18. Ms. Balma found out she was pregnant in early 2014, and as a result, her doctor placed her on a 10-pound lifting restriction at work. Her job, however, required her to lift in excess of 10 pounds on a regular basis. Ms. Balma contacted her employer to inquire if any other position or accommodation was available because of her newly instituted restrictions. Her employer informed her that no such

accommodation existed and that she could not obtain a different position without the lifting requirement. She then requested a leave of absence under the FMLA, but her employer denied this request because she had not been employed for over a year. Because she could no longer work in the position she held, her employer terminated from her employment. Her employer even told her that she would be eligible for UI benefits.

19.   When they reported her separation to the Agency, Ms. Balma's employer erroneously characterized her separation as a "leave of absence" because they said they would consider rehiring her when the lifting restriction was over.  Ms. Balma was in fact terminated. Nevertheless, the discrepancy between the separation reasons given by Ms. Balma and her employer mismatched, which automatically triggered a finding by the Agency that Amanda fraudulently obtained benefits.

20.   Plaintiff Kevin Grifka is a unionized electrician and a resident of Washtenaw County. He was laid off from his employer on February 7, 2014. He applied for benefits shortly thereafter and was approved without issue. He continued to receive benefits through the spring and summer of 2014 and returned to work in early fall of 2014.

21.   Months later, in December, Mr. Grifka received an invoice stating that he owed the Agency over $12,000 in restitution because he was not entitled to benefits. This was the first he had heard of any such issue with his claim. He

attempted to appeal to an ALJ, but it was denied as untimely, as the Agency claimed it had mailed him a notice of redetermination in October, a notice he never received.

22.     The administrative error in Mr. Grifka's case is discerned from a review of his case file. The Agency misattributed Mr. Grifka's earnings, which were all earned prior to his lay-off, by spreading them out through the entire first quarter of 2014.

23.     During the time before his layoff on February 7, he earned wages totaling $9,407.13. After that time, for the remainder of the quarter, Mr. Grifka did not work and received no earnings.

24.     The Agency however, claimed that after his layoff, Mr. Grifka made $723.62 per week. Mr. Grifka's wages earned before his layoff divided by 13, the number of weeks in a quarter, is $723.62, which is the exactly the amount the Agency's records claim Mr. Grifka earned during the weeks that he was laid off. The Agency's determination, therefore, appears to be based solely on an egregious error by the Agency's computer system.

25.     Under the Agency's robo-adjudication system, however, this error alone was enough to find Mr. Grifka ineligible for benefits and assess hefty restitution penalties on him. As a result, the Agency intercepted his state and federal tax returns, depriving him of over $9,000 of money to which he was legally entitled.

26.     If any human being had looked at his file at any time during this process, they could have easily seen their error and corrected it. No such human reviewed the file, however, and Mr. Grifka was assessed significant penalties for something he clearly never did.

27.     Plaintiff Brian Saylor was a seasonal employee who worked for a lawn sprinkler and plumbing business. He is a resident of Oakland County. After the 2013 season ended, Mr. Saylor applied for UI benefits and was paid $270.00 in benefits per week for 15 weeks.

28.     Mr. Saylor then received a determination stating that he was ineligible for benefits and that he had committed intentional misrepresentation. Mr. Saylor appealed both determinations to an Administrative Law Judge.

29.     Like Ms. Balma, the issue in Mr. Saylor's case stemmed from a dispute about his reason for separation from employment. Following an incident on November 15, 2013, in which his team leader accosted him and used profanity, Mr. Saylor called the team leader's supervisor to inform him of the incident. During this conversation, the supervisor told Mr. Saylor he was laid off because there were only a few days left in the season. It was mid-November and lawn sprinkler work was coming to an end. The employer, however, maintained that he had quit.

30.     Ultimately, the ALJ found that Mr. Saylor was entitled to benefits because the employer could not establish that Mr. Saylor had quit. The ALJ consequently reversed the Agency's eligibility and fraud determinations.

31.     This is the sort of garden-variety factual dispute which the UI system was set out to adjudicate; an employer claims one thing, the employee claims another, and an ALJ decides the issue.

32.     In Mr. Saylor's case, the ALJ found for the employee. Yet under Defendants' robo-adjudication system, the simple fact of the discrepancy itself led to an automatic finding of fraud—and an assessment of over $19,000 in fines— against Mr. Saylor who reported his situation honestly and in good faith. The employer was never accused of fraud.

33.     Plaintiff Nancy Wessinger applied for and received UI benefits in November 2012. She received $362.00 in benefits over 20 weeks.  Ms. Wessinger had been a substitute art teacher for Professional Education Services Group, LLC (PESG). She is a resident of Washtenaw County.

34.     Her former employer claimed Ms. Wessinger had refused work "for personal reasons." Ms. Wessinger denied this.

35.     Based on only this factual dispute, the Agency charged her not only with refusing to accept work, but with misrepresentation. It was unclear from any of

the communications with the Agency what exactly the factual basis for finding of fraud was, or what information she had allegedly misrepresented to the Agency.

36.     Ms. Wessinger protested these determinations in August 2014, and the Agency reversed them both in redeterminations in November 2014, after the Agency accused her of fraud and assessed her over $23,000 in penalties.

37.     Plaintiff Jordan Miller is a Washtenaw County resident who applied for unemployment benefits in December 2012. She was approved and began receiving benefits until April 2013.

38.     Over six months later, in November 2013, she received a letter regarding her eligibility for unemployment benefits. Not having received benefits for several months and believing the form was sent in error, Ms. Miller did not respond to the Agency's questions.

39.     Later, she found out that due to her failure to respond, the Agency had determined that she had intentionally misrepresented information to the Agency. The Agency's decision was based on a determination that Ms. Miller had not filed for UI benefits on time when she began receiving benefits in December 2012. The fraud determination was made for only two weeks in February 2013, a full two months after she began collecting benefits.

40.     Because she had passed the appeal deadline, Ms. Miller had no avenue with which to contest the Agency's clearly erroneous finding. She was therefore held

12

responsible for approximately $3,500 in restitution. The Agency then garnished her wages in the amount of approximately $1,800 per month.

41.    Plaintiff Michelle Witt is a resident of Wayne County. Ms. Witt is a bus driver during the school year and works substantially fewer hours during the summer. Each summer, she applies for "underemployment benefits" as she is eligible to do under the law.

42.    Each week during her benefit period, she reported the earnings she received from her employer to the Agency. However, she was later accused of misrepresentation by the Agency, purportedly because she failed to report these earnings and they mismatched with employer provided records.

43.    As the ALJ who ultimately heard her case stated, "Agency documents provided inconsistent information, and information provided by Employer was inaccurate." However, solely because of this inconsistent and erroneous information provided by the Employer and the Agency, Ms. Witt was accused of intentional misrepresentation and assessed severe financial penalties.

44.    Plaintiff Jennifer Zynda was employed as a procurement technician at an eye bank. After she was terminated from employment in December 2012, she applied for and received benefits.

45.    Over a year later, in February 2014, she received a redetermination from the Agency stating that she was disqualified because she had committed "misconduct" on the job and that she had obtained her benefits fraudulently.

46.    Ms. Zynda appealed both of these determinations to an ALJ, who found that she was eligible because she had not committed misconduct. Her former employer even wrote to the ALJ, stating that Ms. Zynda was not guilty of misconduct on the job. Accordingly, the ALJ reversed the Agency's fraud determination in a decision issued July 22, 2014.

47.    The Agency's fraud finding appeared to have been the result of Ms. Zynda's answer to an eligibility questionnaire in which she stated, accurately and honestly, that she had not been fired for misconduct.

48.    The Agency apparently found that since it had made a legal conclusion that Ms. Zynda had been terminated for "misconduct" that her answer to the contrary must have been an attempt to fraudulently obtain benefits.

49.    Then, in March 2015, eight months after the ALJ had ruled her eligible and over two years after she began receiving benefits, she received yet another request for information relating to her eligibility and a fraud questionnaire related to a single work search form in December 2012.

50.    Ms. Zynda has submitted all of the appropriate documentation to the Agency and is awaiting a determination.

14

51.     Plaintiff Sugar Law Center ("Sugar Law") is a 501(c)(3) non-profit public interest legal organization headquartered in Detroit, Wayne County, Michigan with a mission of providing free and reduced cost legal services to low wage and unemployed workers.

52.     This system has placed a substantial administrative burden on the activities of plaintiff Sugar Law, which routinely handles unemployment appeals of clients who cannot otherwise afford paid legal services. The erroneous determinations of the Agency have placed significant undue burdens on legal services offered by the Sugar Law Center related to UI claims, which forces Sugar Law to utilize a substantial amount of its resources to deal with faulty, easily correctable, administrative processes at the Agency.

53.     The plaintiff International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") is a labor organization headquartered in Detroit, Wayne County, Michigan.

54.     UAW members experience unemployment and file claim for UI benefits in Michigan.  The UAW has historically litigated cases raising legal issues regarding UI benefits to promote the fair and impartial administration of UI laws in Michigan. The UAW seeks to protect the constitutional and statutory rights of its claimant members and to advance the interests of other claimants through the litigation of this case.

15

## IV. Common Factual Allegations

55.     The Agency is authorized by and operates under the requirements of the federal Social Security Act, 42. U.S.C. § 501 *et seq.*, and the Federal Unemployment Tax Act, 26 U.S.C. § 3301 *et seq.*

56.     Pursuant to these federal laws, the Agency collects state payroll taxes from covered employers in Michigan and pays UI benefits to eligible claimants.

57.     To qualify for benefits an individual must establish that they were employed by a covered employer and meet certain wage and work eligibility requirements. A claimant must also establish they were not separated from employment due to misconduct connected to the work and did not voluntarily leave employment without good cause.

58.     Eligible claimants, including the individual Plaintiffs herein, have property interests created by state and federal law in any UI benefits, which are protected by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the constitutional rights incorporated therein.

59.     Under Defendants' authority, the Agency has established policies, practices, procedures, and customs regarding the payment of UI benefits in Michigan, the detection and enforcement of fraudulent UI claims, and the collection of overpayments.

60.     Under Defendants' authority, the Agency has applied a computer application to search for discrepancies in the records of individuals who are receiving, or have previously received, UI benefits and their employers.

61.     If a discrepancy is found between a record submitted by an employer and corresponding information reported by the claimant when applying for benefits, the Agency's computer program automatically flags the claimant's file as a potential case of claimant misrepresentation.

62.     Even though the discrepancy may also be the result of an employer error or good faith dispute, no corresponding process is employed to flag an employer's file for potential misrepresentation.

63.     This process can occur at any time, even several months after a claimant has stopped collecting benefits and is no longer regularly interacting with the UIA.

64.     Once a claimant's file has been flagged, the computer system begins the process of determining whether or not the claimant has committed intentional misrepresentation without any human input or evaluation.

65.     The computer thus automatically prepares a form letter addressing the claimant's eligibility for benefits and requesting more information related to potential misrepresentation.

66.     This letter states: "A question of eligibility and/or qualification has been raised on this claim" and instructs the claimant to respond to a set of questions on the reverse side of the form.

67.     If received, this letter is the first time a claimant is informed of an issue regarding their UI benefits.

68.     When generated in the computer, this form does not identify "question of eligibility and/or qualification," nor does it state on what information the new question was based.

69.     The reverse side of this form states "Additional information is necessary regarding misrepresentation" and requests that claimants answer two computer generated questions.

70.     First, the claimant is asked: "Did you intentionally provide false information to obtain benefits you were not entitled to receive?" And second, "Why did you believe you were entitled to benefits?" with a list of 8 responses including "I needed the money," "I did not understand how to report my earnings or separation reason," and "Someone else certified (reported) for me."

71.     The form does not provide an option for claimants to state that they believe they are legitimately entitled to unemployment benefits and have reported their information in good faith.

72.     In order to give such an answer a claimant must write in their response under the "other" section of the form.

73.     The document does not provide the claimant with notice of what the discrepancy actually is, making it nearly impossible for a claimant to formulate a proper response to the charge of misrepresentation.

74.     If the Agency does not receive a reply to this letter within ten calendar days or receives a response the computer deems unsatisfactory, the Agency's computer system robo-adjudicates the fraud issue and automatically determines that the claimant has knowingly and intentionally misrepresented or concealed information to unlawfully receive benefits.

75.     In many cases, the determination is automated and made by a computer without the benefit of any investigatory review, or human input or evaluation of any kind.

76.     Once a robo-adjudication occurs, the claimant is automatically ineligible for hardship waivers that would otherwise be available.

77.     The accusation of fraud alone is also enough to deprive a claimant of their right to a free advocate under Michigan's Advocacy Assistance Program operated by the Agency. MCL 421.5a.

78.     Once the computer has made this determination, the Agency sends the claimant another form letter entitled "Notice of Determination" which states "Your

actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive."

79.    The "Notice of Determination" letter also does not state what these actions were, or give any information as to why the claimant is no longer eligible. The letter terminates benefits on any active claims and states that the person is required to pay the amount assessed on the determination.

80.    Enclosed with this letter is a document titled "Restitution (List of Overpayment)" which lists the amount of alleged overpayment and seeks the repayment of the actual benefits paid in addition to a statutory penalty for fraudulent misrepresentation of four times that amount, for a total assessment of five times the benefits received or sought by the claimant.

81.    Claimants have the opportunity to appeal this determination to an Administrative Law Judge within 30 days after the determination is made.

82.    Until a claimant makes such an appeal, an actual Agency employee has often never been involved in evaluating a fraud case which the computer has robo-adjudicated.

83.    The Agency routinely fails to send fraud questionnaires, notices, and redeterminations to claimants at their current address, and so claimants are unaware of any issue regarding their UI benefits until after the appeal deadline has passed and they have been assessed thousands of dollars in fines.

84.     This system is constitutionally deficient and routinely deprives individual unemployment claimants, who are some of the state's most economically vulnerable citizens, of their most basic constitutional rights.

## V. Causes of Action

### COUNT I
### Constitutional Violations

85.     Plaintiffs herein reincorporate their allegations in the above paragraphs.

86.     Defendants' actions have deprived plaintiffs, and many others like them of their fundamental constitutional rights, including but not limited to the right due to process, the right against self-incrimination, the right to not be subjected to excessive fines, and the right to be free of unwarranted searches and seizures.

87.     Defendants have created a system that deprives claimants of their right to due process.

88.     Claimants have a constitutional right to know the allegations against them and the information on which they are based.

89.     The notice provided by the Agency falls well short of the constitutional standard of due process. The Agency's communication with claimants provides them with absolutely no notice of the reasons for which their eligibility is being questioned.

90.     The forms provided by the Agency are confusing even to those experienced with the workings of the unemployment insurance system, much less ordinary citizens attempting to navigate the UI system after a recent job loss.

91.     Even after a determination has been made and severe fraud penalties assessed, the Agency's communications with claimants often still does not inform them of what the problem was with their claim, what information it was based on, and what the claimant could do to rectify the situation. This process is wholly inadequate and deprives claimants of their right to a fair hearing and due process of law.

92.     Defendants' actions violate claimants' rights against self-incrimination by presuming fraudulent intent against claimants who do not return the computer-generated questionnaire—without a hearing, without human review, and without any factual basis to support a finding of fraudulent intent.

93.     The Agency violates constitutional rights of beneficiaries by drawing negative inferences and presuming fraudulent intent based solely on the fact that no response was received within ten days or that beneficiaries chose to exercise their constitutional right to remain silent.

94.     The fines assessed for the Agency also violate the constitutional prohibition on excessive fines. The Agency has a practice and procedure of assessing

a penalty of five times the benefit sought or received, an amount that often runs into tens of thousands of dollars.

95.     This amount is being assessed by the computer system against *all* claimants accused of misrepresentation regardless of the facts or circumstances of the case.

96.     Many of these cases are the result of simple administrative discrepancies, computer errors, or misunderstandings. Yet the agency assesses punitive financial penalties against people who have experienced recent unemployment and are in many cases among the State's most economically disadvantaged citizens. Under the circumstances, these fines exceed the constitutional limits on excessive fines.

97.     Defendants' actions also violate claimants' rights to equal protection under the law. The Agency's systems automatically presumes that claimants, and not employers, have misrepresented information based on routine administrative discrepancies.

98.     The Agency has no rational basis for concluding that the cause of any discrepancy is that claimants, and not employers, have misrepresented information to the Agency.

99.     Defendants' actions violate the constitutional right to due process because the quituple penalty provision constitutes a criminal penalty imposed

without a hearing and often based solely on a claimant's silence in the face of the accusation.

100.   Criminal penalties may not be imposed on an individual who has not been afforded the protections that the constitution requires, including the requirement that the offense be proved beyond a reasonable doubt

101.   The UIA fraud determination imposes punitive quintuple penalties and notifies beneficiaries of criminal prosecution of fraudulent unemployment insurance claims along with procedures for the referral of cases to local prosecutors for prosecution.

102.   The penalties imposed by the UIA are punitive in nature, resulting in the seizure of large penalties from individuals who are without a source of income, and go well beyond the amount necessary to make the state whole and maintain the integrity of the UI trust fund.

103.   The use of fraud findings with quintuple penalties is directed at traditional criminal law goals such as retribution rather than another non-punitive reason.

104.   The state must provide traditional procedural safeguards of the criminal justice system before imposing such a penalty on its citizens.

105.   Defendants' practices also violate the constitutional guarantee against unreasonable searches and seizures. Claimants who have been robo-adjudicated by

the Agency to have committed intentional misrepresentation are also automatically subject to a variety of collection procedures, including the reduction of future benefits and the interception of their state and federal tax returns, or even future wage garnishment.

106.   Claimants also have property rights in their benefits and state tax returns, and the Agency's actions deprive claimants of this property without a warrant and without due process of law.

107.   Each of the foregoing constitutional protections has been incorporated against the states under the Fourteenth Amendment to the United States Constitution.

## COUNT II
## Violations of the Social Security Act

108.   Plaintiffs herein reincorporate their allegations in the above paragraphs.

109.   Defendants' conduct complained of herein also violates the Plaintiffs' rights under the federal Social Security Act 42 U.S.C. § 300 *et seq.* including, but not limited to their right to a fair hearing and their right to be paid benefits promptly when due.

110.   Section 303(a)(3) of the Social Security Act, 42 U.S.C. § 503(a)(3) mandates that states provide claimants with an "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied."

111.   The Social Security Act's mandate of a fair hearing requires, at a minimum, that such hearing meet constitutional guarantees.

112.   As Defendants' actions have violated established constitutional principles, Defendants' actions described herein also deprive Plaintiffs of their right to a fair hearing under the Social Security Act.

## COUNT III
## Violations of the Michigan State Constitution

113.   Plaintiffs herein reincorporate their allegations in the above paragraphs.

114.   Defendants' actions herein described also violate Plaintiffs' rights under the Michigan Constitution.

115.   Article 1 § 17 of The Michigan Constitution of 1962 provides: "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. . ."

116.   Article 1 § 16 of The Michigan Constitution of 1962 provides: "Excessive bail shall not be required; excessive fines shall not be imposed; cruel or unusual punishment shall not be inflicted; nor shall witnesses be unreasonably detained"

117.   For the reasons outlined above, Defendants' conduct violates Plaintiffs' fundamental rights to due process of law and the right against self-incrimination.

118.   For the reasons outlined above, Defendant's conduct violates Plaintiffs' rights to be free from excessive fines.

26

## VII. Prayer for Relief

**WHEREFORE,** the Plaintiffs ask this court to grant them the following relief

 A.  Assume jurisdiction of this matter;

 B.  Declare the constitutional and statutory rights of the plaintiffs were violated by the actions and policies of the Defendants acting under color of state law;

 C.  Enjoin the Defendants from future violations and require the Defendants to establish and maintain proper procedures for the determination of UI benefit fraud;

 D.  Reopen the unemployment case file of any claimant who was accused of and/or robo-adjudicated as fraud by the Agency's automated system and provide each claimant with an individualized review of their case before the assessment of punitive fines occurs;

 E.  Order Defendants to return any state or federal tax return or wages garnished or intercepted based on a robo-determination or otherwise where no specific finding of fraudulent intent has been made;

27

F.    Provide appropriate compensatory damages to the individual Plaintiffs for the economic and non-economic impact of the practices complained of herein;

G.    Grant Plaintiffs' their attorney's fees and costs incurred in the prosecution of this matter; and,

H.    Grant all other relief at law and equity to which Plaintiffs may be entitled.

Respectfully Submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

/s/ David M. Blanchard
David M. Blanchard (P67190)
Joseph X. Michael (P79084)
Attorneys for Plaintiffs
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dblanchard@nachtlaw.com
Dated:  April 21, 2015          jmichaels@nachtlaw.com

## <u>DEMAND FOR JURY TRIAL</u>

NOW COMES Plaintiffs, by and through their attorneys, NACHT, ROUMEL, SALVATORE, BLANCHARD & WALKER, P.C., and hereby demand a trial by jury in the above-captioned matter.

Respectfully Submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

<u>/s/ David M. Blanchard</u>
David M. Blanchard (P67190)
Joseph X. Michael (P79084)
Attorneys for Plaintiffs
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dblanchard@nachtlaw.com
Dated:  April 21, 2015          jmichaels@nachtlaw.com

29