**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER ZYNDA, et al.

      Plaintiffs,

v.                                 Case No. 15-11449

STEVE ARWOOD, et al.

      Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION TO DISMISS**

Plaintiffs, who are various individual unemployment-benefit claimants along with an association and a union (Sugar Law Center, and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW")), filed suit alleging various Constitutional and statutory violations arising from Michigan's administration of its unemployment benefits program. (Dkt. #1, Pg. ID 2.) Before the court is Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. # 10.) In response, Plaintiffs timely amended their Complaint as a matter of course (Dkt. # 13) and filed a response (Dkt. # 17). Defendants have filed their reply. (Dkt. # 20.) The matter has been fully briefed and the court concludes a hearing on the motion is unnecessary. *See* E.D. LR7.1(f)(2). For the reasons stated below, the court will grant in part and deny in part Defendants' Motion to Dismiss.

## I. BACKGROUND

Michigan's Unemployment Insurance Agency ("UIA") incorporates a fraud detection system. Plaintiffs comprise three groups: 1) seven individual unemployment-benefit claimants who have had varying levels of interaction with the fraud detection system, either while receiving benefits or at some point after they returned to employment; 2) the Sugar Law Center, a legal-aid organization that provides legal services to low-wage and unemployed workers, including assistance with unemployment-benefit programs; and 3) UAW, a labor organization with members who claim to have been affected by UIA's fraud detection system. (Dkt. # 13, Pg. ID 155-64.) Defendants, sued in their official capacity, are the Acting Director of the Michigan Department of Talent and Economic Development (Steve Arwood), and the Director of UIA (Sharon Moffett-Massey). (*Id.* at Pg. ID 154-55.)

UIA has implemented fraud-detection software that scans past and present claimants' records and searches for inconsistencies in the data that might indicate fraud. (Dkt. # 13, Pg. ID 150, 165). In part, the data originate from a claimant's application for benefits and also bi-weekly updates on earnings that unemployment-benefit recipients must submit to UIA in order to continue receiving payments. (Defs.' Mot. 7-8.) Employers also independently submit information about employees, for example, describing why an employee was discharged. (Dkt. # 13, Pg. ID 156.) To obtain benefits, a claimant must meet certain wage and work eligibility requirements and show that he was neither fired for misconduct nor voluntarily left employment without good cause. (*Id.* at Pg. ID 165)

2

If the fraud-detection software finds a discrepancy, either between the claimant- and employer-submitted information or potentially in a claimant's bi-weekly reports, UIA's system generates and sends a questionnaire to the claimant. (*Id.* at Pg. ID 166.) This questionnaire helps the Agency detect incidents of fraud by asking the following two questions: 1) "Did you intentionally provide false information to obtain benefits you were not entitled to receive?"; and 2) "Why did you believe you were entitled to benefits?" (*Id.* at Pg. ID 167.) Claimants are required to respond to the fraud questionnaire quickly, as UIA must receive the completed form in ten days. (*Id.* at Pg. ID 168.) Additionally, the questionnaire form contains no specific information about the claimant or any alleged or possible misrepresentation. (*Id.* at Pg. ID 167.)

Plaintiffs aver that if UIA does not receive a response or the software deems the response unsatisfactory, then "the Agency's computer system robo-adjudicates the fraud issue and automatically determines that the claimant has knowingly and intentionally misrepresented or concealed information to unlawfully receive benefits." (*Id.*) A number of consequences flow from this result. Upon an accusation of fraud, a claimant is no longer allowed to receive assistance from the Agency-administered Advocacy Assistance Program that otherwise would aid the claimant. (*Id.*) The claimant also receives a "Notice of Determination" terminating benefits and stating, "[y]our actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive." (*Id.*) Enclosed with the notice is a "Restitution (List of Overpayment)" that informs the claimant of the amount he now owes UIA. (*Id.* at Pg. ID 169) That amount is the value of the benefit received or sought by the claimant plus a fourfold penalty (Plaintiffs refer to it as "quintuple") (*Id.*). The notice does not contain any

specific information about the alleged misrepresentation, or any particularized explanation for the termination of benefits. (*Id.* at Pg. ID 168-169.) Claimants have thirty days to appeal the determination to an ALJ. (*Id.* at Pg. ID 169.) If no appeal is taken, the determination becomes final and UIA, in some cases, initiates wage garnishment and tax return seizures in order to satisfy the claimant's debt. (*Id.* at Pg. ID 153.)

Plaintiffs allege that the agency, at times, fails to send fraud questionnaires and, upon receiving no response, issues automatic fraud determinations without any basis for believing the claimant received the questionnaire. (*Id.* at Pg. ID 151.) They also allege that flaws in UIA's system cause returned questionnaires to be ignored or result in tabulation errors that cause the software to make erroneous fraud determinations. (*Id.* at 152.) When such errors occur, Plaintiffs assert, there is no attempt by UIA to determine, before benefits are terminated, whether the identified discrepancy was a result of administrative error, good faith dispute, or misrepresentation by the employer. (*Id.*)

Plaintiffs have now filed the instant federal action under 42 U.S.C. § 1983, arguing that the UIA's fraud determination system violates various constitutional and federal statutory rights.

## II. STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows for dismissal for "lack of jurisdiction over the subject matter." When a defendant challenges subject matter jurisdiction pursuant to this Rule, the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Mich. S. R. R. Co. v. Branch & St. Joseph Ctys. Rail Users*

4

*Ass'n Inc.*, 287 F.3d 568, 573 (6th Cir. 2002). In determining whether the court has subject-matter jurisdiction, the court must assume that the complaint's allegations are true, as construed in the light most favorable to plaintiff. *3D Systems, Inc. v. Envisiontec, Inc.*, 575 F. Supp. 2d 799, 802-03 (E.D. Mich. 2008).

A Rule 12(b)(1) motion may challenge the sufficiency of the pleadings (a facial attack) or the factual existence of subject matter jurisdiction (a factual attack). "In the case of a factual attack, a court has broad discretion with respect to the evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994))

## B. Federal Rule of Civil Procedure 12(b)(6)

A complaint is dismissed for "failure to state a claim upon which relief can be granted" only when, construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996).

## III. DISCUSSION

5

Plaintiffs' claims are based on a number of alleged violations, Constitutional and statutory, arising from UIA's practice of sending fraud questionnaires and the administration of their fraud detection system. Plaintiffs contend that these practices (1) deprive claimants of their right to due process under the Fifth and Fourteenth Amendments to the Constitution because the fraud questionnaires and determination notices provide no notice of the allegations brought against them, and that this lack of notice, among other systemic problems, deprives claimants of a fair hearing; (2) deprive claimants of their due process rights because the punitive, quintuple penalties imposed by this administrative system are actually criminal penalties requiring the full panoply of due process rights; (3) deprive claimants of the privilege against self-incrimination under the Fifth Amendment because the fraud questionnaires ask claimants to admit to fraud and threaten the termination of benefits for failure to respond and waive the right; (4) violate the Eighth Amendment's prohibition on excessive fines because large fines are assessed without consideration of individual claimants' conduct; (5) violate the Fourteenth Amendment right to equal protection because there is no rational basis for the UIA system's presumption that claimants, not employers, have made the alleged misrepresentation; (6) violate the Fourth Amendment prohibition of unreasonable seizures because the State's practice of garnishing wages and intercepting tax returns constitutes a seizure "without a warrant and without due process of law," (Pls.' Compl. ¶ 111); (7) violate the Social Security Act, 42 U.S.C. § 300 *et seq.*, by depriving claimants of the right to a fair hearing and to be paid benefits promptly when due. Plaintiffs also allege various analogous state constitutional claims.

The arguments laid out in Defendants' Motion to Dismiss can be grouped into two categories. First are the arguments that, if correct, would deprive this court of subject matter jurisdiction and are best considered under Rule 12(b)(1). Defendants contend (1) that the claims are barred by the Eleventh Amendment, (2) that Defendants are not "persons" under § 1983 and therefore cannot be sued, (3) that the court should exercise its discretion to abstain from exercising jurisdiction over this case under the *Burford* doctrine, and (4) that all of the Plaintiffs lack standing to bring this action. The second set of arguments directly attack Plaintiffs' claims, and should be considered under Rule 12(b)(6). Defendants argue that Plaintiffs' claims based on (1) the self-incrimination privilege of the Fifth Amendment, (2) the excessive fines clause of the Eighth Amendment, and (3) the Fourth Amendment, and (4) the Social Security Act all fail to state a claim. Defendants do not here challenge Plaintiffs' due process or equal protection claims.

The court will first consider Defendants' jurisdictional arguments and second their arguments on the merits.

## A. Jurisdictional Arguments

### 1. Eleventh Amendment Immunity

Defendants argue that Plaintiffs' claims are barred by the Eleventh Amendment because these claims against state officials are, in essence, claims against the state of Michigan. The Eleventh Amendment proscribes lawsuits "against one of the United States by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment bars suits against the state by citizens of that state, as well. *Hans v. Louisiana*, 134 U.S. 1 (1890). Additionally, even when the state is not the named party,

7

a suit against a state official is also prohibited when "the action is in essence one for the recovery of money from the state." *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 464 (1945) *overruled on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002). That is, when "the judgment sought would expend itself on the public treasury or domain," it is a suit against the state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n. 11 (1984).

There are, however, exceptions. One was established in *Ex parte Young*: the Eleventh Amendment does not prohibit federal courts from issuing injunctions ordering prospective relief against state officials to prevent future constitutional violations. *Barton v. Summers*, 293 F.3d 944, 948 (2002) (citing *Ex parte Young*, 209 U.S. 123, 159-160 (1908)). Even an injunction that would require the state to spend substantial sums of money may not be barred, so long as the injunction is prospective. *See Nelson v. Miller*, 170 F.3d 641, 646 (1999). That is not to say, however, that the Eleventh Amendment will countenance any relief granted by a federal court simply because it is styled as an injunction. The injunction must be forward looking, but the difference between injunctions appropriately ordering prospective relief and those improperly awarding retroactive remedies "will not in many instances be that between night and day." *Edelman v. Jordan*, 415 U.S. 651, 667 (1974).

In *Edelman*, the Supreme Court clarified the dividing line between allowable, prospective relief and retroactive relief barred by the Eleventh Amendment. Plaintiffs in that case challenged the state's failure to comply with federal law in administering the Aid to the Aged, Blind, and Disabled ("AABD") program. That program was the product of a state-federal partnership, but the state law implementing the program was in

8

conflict with processing deadlines imposed by federal law. The district court declared the state law invalid and entered an injunction requiring compliance with the federal time limits. However, one portion of the injunction required state officials to "release and remit AABD benefits wrongfully withheld to all applicants for AABD" who had applied while the federal deadlines were in place but were subjected to delays caused by the state law. *Id.* at 656. The court of appeals upheld this portion of the injunction because it was in the form of "equitable restitution" and not monetary damages. *Id.* at 665.

The Supreme Court rejected this reasoning. The Court did "not read Ex parte Young or subsequent holdings of th[e] Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled 'equitable' in nature. The Court's opinion in Ex parte Young hewed to no such line." *Id.* at 666. The Eleventh Amendment will tolerate an injunction that "requires payment of state funds . . . as a necessary consequence of compliance *in the future* with a substantive federal-question determination." *Id.* at 668 (emphasis added). However, styling relief as "injunctive" or "equitable" cannot save a remedy that is truly a backward-looking award of compensatory damages. The Supreme Court made clear that an award "measured in terms of monetary loss resulting from past breach of a legal duty on the part of the defendant officials" is barred by the Eleventh Amendment. *Id.*

This is the variety of relief these Plaintiffs seek. They request that the court "[o]rder defendants to return any state or federal tax return or wages garnished or intercepted" by the state. (Pls.' Compl. at ¶ E.) Relief styled as such an "order to return" money is not "prospective." It compensates Plaintiffs for a past wrong, and the amount

9

owed would be "measured in terms of monetary loss resulting from past breach of a legal duty on the part of defendant officials." *See Edelman*, 415 U.S. at 668. This claim for relief is barred by the Eleventh Amendment.

Also of concern is Plaintiffs' request that the court order UIA to "[r]eopen the unemployment case file of any claimant who was accused of and/or robo-adjudicated as fraud [sic] by the Agency's automated system and provide each claimant with an individualized review of their [sic] case before the assessment of punitive fines occurs."

In *Carten v. Kent State University*, 282 F.3d 391, 396 (6th Cir. 2002), the Sixth Circuit held that a claim for reinstatement as a student in a public graduate school program from which the student had been expelled is prospective injunctive relief allowed under *Ex parte Young*. The *Carten* court reasoned that "claims for reinstatement state a violation that continues during the period the plaintiff is excluded from the benefits to which he is entitled." *Id.* This rationale, which this court is  bound to apply, embraces the instant claims to the extent that a Plaintiff asks the court to order reinstatement of his *current and continuing* eligibility for unemployment benefits. Relief cast in this way falls within the *Ex parte Young* exception to Eleventh Amendment immunity under *Carten*. However, to the extent such sought relief would require Defendants to reopen a case and compensate a Plaintiff for previously unpaid benefits, this is prohibited retroactive relief barred by the Eleventh Amendment.

However, Plaintiffs are permitted to proceed with such declaratory and injunctive requests as are truly prospective. This includes seeking an order that Defendants

10

establish and maintain procedures for detecting and acting upon incidents of fraud that meet Constitutional standards.[1]

## 2. Section § 1983 "Persons".

The Eleventh Amendment analysis relates closely to Defendants' argument that they are not "persons' under § 1983. In *Will v. Michigan Department of State Police*, the Supreme Court recognized that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 'because official-capacity actions for prospective relief are not treated as actions against the State.'" 491 U.S. 58, 71 n. 10 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985)). Defendants argue that because some of the relief requested by Plaintiffs is retrospective in nature, *Will* does not apply. As the court has determined that Plaintiffs' claims for retrospective relief are barred, all that is left in this action are prospective claims for relief. Thus *Will* is applicable and Plaintiffs may proceed against Defendants on their prospective claims for relief.

## 3. *Burford* Abstention

Defendants also urge the court to abstain from hearing this case under *Burford v. Sun Oil Corp.*, 310 U.S. 315 (1943). The *Burford* doctrine requires that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must

---

[1] Defendants also argue —in passing, it appears, but in any event fruitlessly— that Plaintiffs' request for attorney's fees is barred by the Eleventh Amendment. It is not. A court may indeed order a state to pay attorney's fees to a successful civil rights plaintiff pursuant to 42 U.S.C. § 1988. *Hutto v. Finney*, 437 U.S. 678 (1978).

11

decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*") (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). At core, the *Burford* doctrine is meant to prevent federal courts from "resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." *Adrian Energy Assoc. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 423 (2007).

The *Burford* doctrine is not apt here. Resolution of this case would not require the court to adjudicate "difficult questions of state law," or balance complex local concerns. Unlike a claim that a state has misapplied its own regulatory scheme by failing to consider some relevant state-law factor, the claim presented in this case involve federal Constitutional law.

Defendants' *Burford* argument essentially amounts to a complaint that resolving this case in Plaintiffs' favor would invalidate portions of a state regulatory system. That possibility does indeed exist. "[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zoblocki v. Redhail*, 434 U.S. 374, 379 n. 5 (1978). Additionally, "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or

12

even when there is a 'potential for conflict' with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 815-816). This action posits that there exist state functions established or managed in a way inconsistent with federal constitutional standards; it will not in any way require the court to jigger with the inner workings of a permissible state scheme. The court must reject the *Burford* abstention argument.

### 4. Standing

The last of Defendants' jurisdictional arguments is that Plaintiffs lack standing. The Constitution limits the scope of federal courts' judicial power to "cases" and "controversies." U.S. Const. art. III, § 2. The doctrine of standing serves to sift the cases and separate those that are properly within the scope of the judicial power from those that are not. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing requires injury in fact, causation fairly traceable to the defendants' conduct, and redressability. *Id.* at 560-61. When the plaintiff is the object of the challenged action "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62.

In this case there are a seven individual Plaintiffs, the UAW union, and the Sugar Law entity, all of whom allege standing to challenge UIA's system for detecting fraudulent unemployment-benefits claims. In cases challenging a government practice or policy on its face, the presence of one party with standing is sufficient. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *ACLU of Ky. v. Grayson County, Ky.*, 591 F.3d 837, 843 (6th Cir. 2010). Plaintiffs' claims that do not seek retroactive relief are best understood as facial challenges. Plaintiffs ask, in effect, for the court to declare the

13

fraud questionnaire procedure unconstitutional, declare that the amount of process provided before the imposition of fines is constitutionally deficient, and strike the portion of Mich. Comp. Laws § 421.54 that provides for the "quintuple" fraud penalty as an excessive fine. To be entitled to this type of injunctive relief, Plaintiffs would need to prevail on a facial challenge to the UIA's practices. *See United States v. Salerno*, 481 U.S. 739, 745 (noting that a showing that a statute may operate unconstitutionally under some circumstances is insufficient to render it wholly invalid)*; Warshak v. U.S.*, 532 F.3d 521, 531 (6th Cir. 2008) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). In light of the court's Eleventh Amendment analysis, and in a facial challenge environment, the court concludes that at least some of the individual Plaintiffs, UAW, and Sugar Law have standing to bring this action. In the interest of judicial economy, the court will not provide an exhaustive standing analysis for each individual plaintiff.

The court is satisfied that at least Plaintiff Zynda has standing to bring this suit; the analysis as to individual Plaintiffs, or any Plaintiff for that matter, need go no further. Plaintiff Zynda applied for and began receiving benefits in late 2012. Due to a discrepancy in the way she and her employer described her separation, she was accused of fraud. Plaintiff Zynda appealed the fraud charge to an ALJ and won a favorable outcome. However, in March, 2015, UIA sent her another fraud questionnaire and has begun again the fraud determination process. As of the start of this litigation, Plaintiff Zynda was still wading through UIA's fraud determination process. (Dkt. # 13, Pg. ID 162-63.)

14

While Defendants are correct to note that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by an continuing, present adverse effects," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), Plaintiff Zynda is presently feeling the impact of Defendants' allegedly deficient process for making fraud determinations. Plaintiffs allege that UIA provides insufficient notice to claimants about why their eligibility is being questioned and why they are being accused of fraud. This, in turn, makes it difficult or impossible for those accused of fraud to prepare to respond to the allegations and deprives them of a right to a fair hearing and due process. It is beyond dispute that injuries to constitutional rights, such as the right to due process, are sufficient to confer standing. *E.g.*, *Wright v. O'Day*, 706 F.3d 769, 771-72 (6th Cir. 2013). Additionally, a litigant can suffer an injury-in-fact from the denial of due process regardless of the effect that more process would have on the outcome of the particular determination at issue. *Id.* at 772 (citing *Goldberg v. Kelly,* 397 U.S. 254, 256 n. 2 (1970)). That Plaintiff Zynda has not yet had an adverse decision rendered against her does not lessen the alleged denial of due process under which she is currently laboring.

UAW also has standing to bring this action. An organization may have standing to sue in a representative capacity when its members have suffered an injury sufficient to satisfy Article III. *E.g.*, *UAW v. Brock*, 477 U.S. 274, 281 (1986). The Supreme Court has articulated a three-part test to determine whether an organization may sue on behalf of its members:

> [A]n association has standing to bring suit on behalf of its members when:
> (a) its members would otherwise have standing to sue in their own right;
> (b) the interest it seeks to protect is germane to the organization's

15

> purpose; and (c) neither the claim asserted nor the relief requested
> requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants

challenge UAW's ability to meet the first and third prongs of this test.

As to the first prong, the UAW alleges that "individual UAW members have been

accused of fraud under the agency's system and other members face the prospect of

future accusation, adjudication or garnishments . . . ." (Dkt. # 13, Pg. ID 164.) At the

motion to dismiss stage, the court "presumes that general allegations embrace those

specific facts that are necessary to support the claim." *Lujan v. National Wildlife*

*Federation*, 497 U.S. 871, 889 (1990). Defendants argue that "[t]he Complaint fails to

assert that any of the Plaintiffs are UAW members and that any such member suffered

an invasion of their legally protected interest." (Defs.' Mot. 23.) This argument

misunderstands what is required at the pleading stage. UAW need not ensure that one

of the individual Plaintiffs is also one if its injured members, nor at this early stage of the

litigation does UAW need to identify a specific member who has been injured. *See U.S.*

*Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 934 (E.D. Mich. 2008) (citing

*Kardules v. City of Columbus*, 95 F. 3d 1335, 1346 (6th Cir. 1996)). UAW has met its

burden by pleading the existence of injured members. If Plaintiffs allegations are taken

as true, as they must be, there are unemployed persons in Michigan who are currently

suffering the present, continuing effects of being cut off from unemployment benefits

due to fraud determinations for which they did not receive the constitutional minimum of

process due them. At this stage, UAW is not required to find and produce members who

fall within this class; it is enough that UAW alleges their existence.

16

And lastly, the court agrees that Sugar Law has standing to bring this action, as well. Unlike UAW, Sugar Law alleges an injury to the organization itself and is not attempting to sue in a representational capacity. While organizations cannot establish standing based on an abstract harm to their ideological interests, the injury arising from the expenditure and diversion of resources "constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). "The Supreme Court and this Circuit have found that a drain on an organization's resources . . . constitutes a concrete and demonstrable injury for standing purposes." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013). This is an injury to the organization itself, and does not implicate "associational standing," which is derived from an injury felt by the organization's members. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332-33 (6th Cir. 2002). Here, Sugar Law asserts standing on its own behalf.

The facts in the Complaint and in affidavits attached to Plaintiffs' Response regarding Sugar Law's receipt of case referrals are essential to understanding its theory of standing. The court is entitled to consider such material when a defendant attacks the factual basis for the court's jurisdiction. *See Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015). The court rejects Defendants' argument that the court should exclude the exhibits Plaintiffs attached to their response, as those exhibits address the factual basis for Plaintiffs' standing.

Defendants attack that factual basis by arguing that "any alleged causation between denial of benefits to specific claimants and Sugar Law's 'administrative burden' is tenuous, at best." (Defs.' Mot. 22.) Sugar Law's explanation of how and why it

17

receives cases, if proven, establishes a sufficient causal link between the fraud determinations at issue and Sugar Law's increased work.

Sugar Law is a legal-aid organization that provides services to low wage and unemployed workers and regularly handles unemployment appeals. (Compl. at ¶¶ 55-56.) Another organization, the State of Michigan's Advocacy Program, is generally the first stop for claimants and employers who are looking for help at unemployment hearings. (Aff. of Tony Paris ¶¶ 6, 9, Dkt. # 17-8, Pg. ID 299-300.) The Advocacy Program refers claimants to other legal-service providers, like Sugar Law, when a claimant does not qualify for their assistance due to the types of issues involved in his appeal. (*Id.* at ¶ 9.) And, as noted earlier, the State's Advocacy Program declines to assist clients who are accused of fraud. (*Id.* at ¶ 10.) As a result, many of the individuals affected by the alleged erroneous fraud determinations are disqualified from receiving the Advocacy Program's assistance and are, in turn, referred to Sugar Law for assistance. (*Id.* at ¶¶ 10, 11.)

Before the implementation of the computerized fraud detection system, Sugar Law "received very few calls involving fraud appeals from the State of Michigan's Program or otherwise." (*Id.* at ¶ 15.) Since implementation in 2013, Sugar Law has received hundreds of calls from claimants involving fraud issues. (*Id.* at ¶ 17.) Sugar Law attorney Tony Paris, the only attorney handling unemployment cases, avers that before 2013, he spent less than twenty-five percent of his time fielding questions about unemployment insurance benefits. (*Id.* at ¶ 20.) Since 2013, he has spent the majority of his time dealing only with fraud charges and helping claimants appeal such allegations. (*Id.*) Additionally, Sugar Law represents that it has had to hire a contract

18

attorney to help process clients, has installed a new phone messaging system to keep up with referral calls, and devotes legal interns' time to these cases. (*Id.* at ¶ 21.)

It is, allegedly, not only the number of fraud determinations that creates a burden on Sugar Law, but also the way UIA's system notifies claimants of fraud allegations. Because the fraud notifications do not include a particularized statement of the basis for the fraud allegation, Sugar Law must spend additional time during intake attempting to determine what might be the problem with any particular claimant's application. (*Id.* at ¶ 23.) Not only does this make claim processing more costly, it also, allegedly, lengthens the administrative hearing process. (*Id.*) On top of this, Sugar Law maintains that claimants often receive notice of a hearing only a week or two prior to the hearing date, requiring the organization to expedite consideration of a claimant's case. (*Id.* at 24.)

The court is satisfied that Sugar Law has carried its burden at this stage of the litigation. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general factual allegations embrace those specific facts necessary to support the claim." *Sierra Club v. EPA*, 781 F.3d 299, 305 (6th Cir. 2015). Plaintiffs have pleaded more than just general facts. They have offered specific facts that, if proved true, show that the high error rate in fraud determinations has lead Sugar Law to divert significant resources to these types of claims. It is also apparent that if the fraud detection system is determined to deprive claimants of due process, either by providing insufficient notice or because of the risk of error and failure to implement procedural safeguards, corrective changes would lessen Sugar Law's burden. Better notice provisions would streamline Sugar Law's intake and review process, and more accurate initial fraud determinations would

19

lessen the number of cases referred to the organization. Thus, the causation and redressability prongs of the standing analysis are met as well.

In cases where the relief requested is in the form of prospective injunctive relief, the plaintiff must also show that there is an ongoing harm or real and immediate threat of repeated injury. *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Here, without a change to the fraud detection system, Sugar Law will continue to devote significant resources to attempting to address claims that are a result of Defendants' conduct. Thus, Sugar Law has standing to request declaratory and injunctive relief.

### B. Merits Arguments

### 1. The Fifth Amendment Right Against Self-Incrimination

Defendants argue that Plaintiffs' self-incrimination claims fail because mandatory state reporting requirements do not violate the Fifth Amendment. Further, they argue that even if such reporting requirements do implicate the Fifth Amendment, the Michigan Employment Security Act, Mich. Comp. Laws § 421.9, contains an immunity provision such that Plaintiffs can be compelled to produce testimonial evidence without fear of criminal prosecution, thus nullifying any Fifth Amendment concerns. Plaintiffs, in turn, argue that the fraud questionnaires do not impose run-of-the-mill reporting requirements, but instead are questions targeted at a group suspected of criminal activity and threaten grave consequences for failure to incriminate oneself. As to immunity, Plaintiffs contend that the terms of the immunity statute do not protect claimants when answering fraud questionnaires, and that the penalties levied as a result of these fraud determinations are themselves criminal penalties implicating the Fifth Amendment.

20

There is no question that any organized society must impose burdens on its members from time to time. *California v. Byers*, 402 U.S. 424, 427 (1971). Pharmaceutical manufacturers are required to disclose information about the content and use of the medications they produce, people who deal in securities must make certain reports to oversight agencies, and nearly all of us must file a tax return, under oath, each year revealing many aspects of our private behavior. Each of these duties requires self-reporting that carries with it some chance of criminal liability arising from the information disclosed. Accordingly, on numerous occasions, the Supreme Court has decided whether a self-reporting requirement carries too high a risk of self-incrimination. Statutes requiring registration of sawed-off shotguns or other illegal weapons, *Haynes v. United States*, 390 U.S. 85 (1968), the reporting of gambling proceeds for taxation, *Gross v. United States*, 390 U.S. 62 (1968), and registration of membership in the Communist Party, *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70 (1965), have all been found to violate the Fifth Amendment privilege. Other reporting statutes have been found constitutional, such as those requiring a driver to stop and identify himself after an accident. *California v. Byers*, 402 U.S. 424 (1971).

From these cases and others, it is clear that the Fifth Amendment Privilege is not violated by all self-reporting requirements, especially those that are essential to the execution of an important regulatory scheme. The Supreme Court and other federal courts have established a number of guideposts for courts in determining whether a self-reporting requirement offends the privilege against self-incrimination. *Byers*, 402 U.S. at 428-431; *U.S. v. Alkhafaji*, 754 F.2d 641, 643-46 (6th Cir. 1985). This Circuit has emphasized three factors: (1) whether the required disclosure was directed at the public

21

at large, as opposed to being extracted from a "highly selective group inherently suspect of criminal activity"; (2) whether the claim of constitutional protection was "asserted in an essentially non-criminal and regulatory area of inquiry," or in an area "permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of the crime"; and (3) whether "compliance with the requirement would create a substantial likelihood of prosecution." *Alkhafaji*, 754 F.2d at 643 (quoting *Albertson*, 382 U.S. at 79). Addressing these points of analysis in turn, the court finds that Plaintiffs' Complaint states a Fifth Amendment claim.

The reporting requirement at issue is imposed on a "highly selective group inherently suspect of criminal activity." First one must understand exactly which "group" is subject to the requirement. Defendants would argue that it is unemployment-benefit recipients in general that are subject to the disclosure requirement, and because being unemployed and receiving state and federal funds is not criminal, those receiving the questionnaire are not part of a highly selective group or inherently suspect of criminal activity. This argument would hold water if the reporting requirement at issue were the initial eligibility questions contained in the unemployment-benefit application materials dealt with by all potential recipients. But that is not the case. The fraud questionnaire is sent only to a subset of the whole, those who are already suspected of perpetrating fraud.

*Byers* is instructive here. 402 U.S. at 431. In that case the Supreme Court scrutinized a statute requiring drivers involved in car accidents to stop and identify themselves, thereby preventing "hit and runs." The Court noted that even when

22

considering the subset of drivers who have been involved in accidents, this is not a "highly selective group" that are "inherently suspect or criminal activities." It is not a criminal offense to be involved in a car accident; the other driver may be at fault, or the accident may occur exogenously, with neither driver at fault. Most accidents occur without any criminal liability arising even when one person is at fault; they are merely negligent as a matter of tort law. *Id.* That is not the case with respect to the fraud questionnaire. The single factor distinguishing those who are subject to the self-reporting requirement from those who are not is that the former are suspected of committing fraud. This is apparent because, as Plaintiffs allege, a fraud determination issues whenever a claimant fails to respond to the questionnaire. The first of the two questions on the form also betrays the State's suspicion because it seems to assume that, at the very least, the claimant made a misrepresentation. (Dkt. #13, Pg. ID 167 ("Did you intentionally provide false information to obtain benefits you were not entitled to receive?").) While the question is susceptible to interpretation, and although it does not quite reach the obviousness of "when-did-you-stop-beating-your-wife?", it does appear that the only issue the question seeks to resolve is whether there was an intentional misrepresentation. Indeed, the form does not offer the claimant a box to check indicating that he did *not* make an intentional misrepresentation; instead he may only note such an explanation in the "other" section of the form. (*Id.*)  The same would be true if he wanted to indicate that there was *accidental* provision of false information; or to explain the provision of false information *not* intended to obtain benefits to which he was not entitled; or the provision of information that he only *later* understood to be false.

The second factor asks the court to consider whether the claim of constitutional protection is asserted in an essentially non-criminal and regulatory area of inquiry, or in an area permeated with criminal statutes in which responding in context might require a person to admit a crucial element of a crime.

This factor does not favor Plaintiffs. The unemployment insurance system is "essentially non-criminal and regulatory," as its purpose is to help individuals who have fallen on hard times, not catch them in criminal conduct. Although the statute does incorporate criminal liability when the system is abused, it is not "permeated" with criminal statutes. The court cannot say, nonetheless, that the questionnaire could not "involve [a claimant] in the admission of a crucial element of the crime." *Alkhafaji*, 754 F.2d at 643. The statute specifies hefty civil and criminal fines for those that defraud or fail to comply with the unemployment system. Mich. Comp. Laws § 421.54 ("Section 54"). Michigan cases hold that "Section 54 of the Employment Security Act is directed at [1] the making of a false statement [2] with an intent to defraud to obtain or increase a benefit." *People v. Robinson*, 296 N.W.2d 99 (Mich. Ct. App. 1980). If a person who was in fact guilty of the crime answered the questionnaire honestly, it would amount to an admission to each element of the crime. This places the claimant in the midst of a trilemma offering one choice from among perjured denial, truthful self-incrimination, or silence resulting in the loss of important financial benefits. Thus, while the unemployment system is essentially regulatory and not criminal, the nature of the questions at issue focus on the criminal elements of the unemployment scheme, heightening the risk of a Fifth Amendment concern.

24

The final consideration is whether compliance with the disclosure requirement would create a substantial risk of prosecution. This factor favors Plaintiffs. Section 54 lays out the criminal liability that attaches to fraudulent unemployment-benefit claims. Mich. Comp. Laws § 421.54 (allowing for imprisonment for up to two years). While the parties have made no representations to the court concerning the criminal prosecution rates in this area of the law (other than to point out that no Plaintiff has been prosecuted), the authorization of prosecution in the statute indicates a "risk" of prosecution.

As noted in their brief, Defendants appear to prefer the four part test articulated in *State ex rel. Osburn v. Cole*, 173 W.Va. 596, 602 (1983). First, this court looks to decisions of the Sixth Circuit and defers to its guidance, not that of the West Virginia Supreme Court. Second, the Sixth Circuit test and the West Virginia test are substantially similar, except that the West Virginia test considers whether the "information sought by the government was neutral, [or] was directed at specific criminal activity." *Id.* at 600. Were the court to consider this factor, the court would find that it weighs against Defendants. The request in the questionnaire is not neutral, but decidedly accusatory: "Did you intentionally provide false information to obtain benefits you were not entitled to receive?" A neutral question concerning a discrepancy in the claimants application might ask "Who is your employer?" The question at issue assumes that a misrepresentation has been made, and asks only whether the misrepresentation was intentional. Additionally, the information sought is not neutral, it is tailored to the elements of the crimes laid out in Section 54. The two questions

25

amount to directly asking the claimant whether he is guilty of a crime. Viewed in the light most favorable to the Plaintiffs, the tenor of the questionnaire is accusatory, not neutral.

Thus the court finds that, based on Plaintiff's allegations, the questionnaires used by the UIA to determine whether claimants have committed fraud do not comport with the Fifth Amendment under *Byers* and its progeny. This, however, does not end the analysis.

A grant of immunity that is coextensive with the scope of the privilege against self-incrimination is sufficient to compel testimony over the a claim of the privilege. *Kastigar v. United States*, 406 U.S. 441, 453 (1972). This is so because the Fifth Amendment privilege attaches only when the witness reasonably believes a disclosure could be used in a criminal prosecution. *Id.* at 444. If a witness is immunized, a fear of prosecution is not reasonable. Defendants argue that such an immunity statute exists in this case. (Defs.' Mot. at 32.) The statute provides:

> No person shall be excused from testifying or from producing books, records or papers in any investigation, or upon any hearing, when ordered to do so by the commission, or its duly authorized agents, upon the ground that the testimony or evidence, documentary or otherwise, may tend to incriminate him or subject him to criminal penalty; but no person shall be prosecuted or subjected to any criminal penalty for, or on account of, any transaction made or thing concerning which he is compelled, upon the claiming of his privilege to testify.

Mich. Comp. Laws § 421.9.

Witnesses who fall within this statute receive transactional immunity for conduct to which they testify. Plaintiffs, however, argue that Mich. Comp. Laws § 421.9 applies only when a claimant is "ordered" to testify by the UIA, and that the questionnaires are not an order within the meaning of the statute.

26

Plaintiffs argument is supported by Michigan case law. Though there appear to be no Michigan cases interpreting § 421.9, the language of this statute is repeated verbatim in other immunity statutes that Michigan courts have interpreted. In *People v. Parsons*, 371 N.W.2d 440 (Mich. Ct. App. 1985), the Michigan Court of Appeals considered Mich. Comp. Laws § 205.3(a), which grants immunity to witnesses in tax evasion cases who testify "when ordered to do so by the commissioner"; this is the same language found in the immunity statute at issue. That court was thus tasked with interpreting the word "ordered." The court noted that the statute authorized the commissioner to issue subpoenas, and that this was the only "order" the commissioner was authorized to give. *Parsons*, 371 N.W.2d at 443. The court concluded, "but as the statute does not mention other situations in which the commissioner may order a person to testify, we have no grounds for extending the transactional immunity provisions to such situations." Section 421.9 is the same. The statute states, "[a]ny member of the commission or its duly authorized agents may issue a subpoena . . . ." Mich. Comp. Laws. § 421.9. The statute mentions no other methods by which the commissioner or his agents may order a witness to come before the commission. Thus, the court agrees that the word "order" in the following sentences of the statute refer to the commissioners power to issue subpoenas. Because the fraud questionnaires are not subpeonas they do not constitute an "order" within the meaning of § 421.9. The immunity statute, therefore, does not resolve the Fifth Amendment concerns raised by the fraud questionnaire, and the court will not dismiss this claim.[2]

---

[2] Because the court is satisfied that the immunity statute does not apply to claimants when responding to fraud questionnaires, the court need not address the

**B. Excessive Fines Under the Eighth Amendment**

Defendants also ask the court to dismiss Plaintiffs' claim that the "quintuple fraud penalty is a grossly disproportionate excessive fine both on its face and as applied to the individual plaintiffs." At the outset, because the court has already determined that Plaintiffs' individual retroactive claims for relief are barred by the Eleventh Amendment, all that is left is the request for prospective injunctive relief concerning reformation of the UIA's fraud determination system. With respect to the Eighth Amendment claim, Plaintiffs ask the court to strike the portion of Mich. Comp. Laws § 421.54 that provides for the quintuple fraud penalty. This form of relief would require Plaintiffs to prevail on a facial challenge to the UIA's practices. *See United States v. Salerno*, 481 U.S. 739, 745 (noting that a showing that a statute may operate unconstitutionally under some circumstances is insufficient to render it wholly invalid)*; Warshak v. U.S.*, 532 532 F.3d 521, 531 (6th Cir. 2008) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). Were Plaintiffs to prevail on their as-applied challenges, the relief arising from those individual claims would be relief "measured in terms of monetary loss resulting from past breach of a legal duty on the part of defendant officials," the exact type of relief barred by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 668 (1974); *see also supra* Part III.A.1 (Eleventh Amendment analysis). Therefore in light of the court's Eighth Amendment analysis, Plaintiff's Eighth Amendment claim will be construed as a facial challenge.

---

related question concerning whether the monetary penalties imposed by the UIA are in fact criminal penalties.

In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court established the standard for evaluating claims under the Excessive Fines Clause. "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334. The Sixth Circuit has held that "the amount of the fine must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Madison*, 226 F. App'x 535, 548 (6th Cir. 2011). "Relevant factors to consider include the nature of the offense and its relation to other criminal activity, the potential fine under the advisory Guidelines range, the maximum sentence and fine that could be imposed, and the harm cause by the defendant's conduct." *United States v. Parenteau*, 805 F. Supp. 2d 438 (6th Cir. 2011). The second and third factors are irrelevant in this case because Plaintiffs challenge the statute on its face and Defendants concede that there is no discretion as to the penalty amount. (Defs.' Mot. 38.) If any penalty is to be accessed it must be in the amount illegally obtained in addition to four times that amount. (*Id.* at 38 (citing Mich. Comp. Laws § 421.54(b)(ii).)

Considering the nature of the offense and the harm caused, the fraud penalty is not excessive. In *Bajakajian*, the Supreme Court held that forfeiture of $357,144 was excessive in part because the underlying offense was Bajakajian's mere failure to report that he was transporting more than $10,000 outside of the country. *United States v. Bajakajian*, 524 U.S. 321, 337-38 (1998). The $357,144 he was transporting was legally obtained, was to be used for a legal purpose, and had he simply reported the money he would have been able lawfully to remove it from the United States. The court noted that the only harm to the government was informational, in that it did not know the money

29

was leaving the country. Incidents of unemployment benefit fraud are not of the same nature. Fraudulent claims against the public fisk do more harm than technical, informational violations of law. There is of course the monetary harm to the limited pool of funds available to be paid out to claimants, but there is also the more general harm to the administration and integrity of the program. Additionally, the State has a strong interest in preventing fraud as a general matter, thus the measure of deterrence that is provided helps to justify the penalty. And lastly, an appreciable portion of the fine is remedial in nature, reimbursing the State for the amount lost and the administrative costs associated with recovering the money.

Further, other courts in this district have approved of penalties in fraud cases where the ratio of the actual damages to the penalty was much higher than 1:5 (which assumes one can fairly characterize dollar-for-dollar reimbursement of ill-gotten money as a "penalty"), or 1:4 under § 421.54. In *U.S. ex rel Smith v. Gilbert Realty Co., Inc*, 840 F. Supp. 71 (E.D. Mich. 1993), the court considered a penalty levied under the False Claims Act. In that case a landlord of residential apartments made seven false statements and wrongly endorsed fifty-one rental checks to a local housing authority, with the amount of actual damages amounting to $1,630. Because the False Claims Act allows for penalties to be assessed for each misrepresentation, his penalties for the fifty-eight false claims amounted to $290,000. The district court found this to be excessive, but approved of a penalty of $35,000, which amounts to an approximate 1:21 ratio of the actual damages to the penalty. There exists a sensible inverse relationship between the dollar amount of the illicit conduct and the ratio of penalties: the smaller the

30

dollar amounts at issue, the more easily can a challenge to high penalty ratios—and a resulting excessive-fines argument—be defeated.

Given the impact fraud has on the administration of public programs, and having in mind the ratio approved of in *Smith*, a 1:5 penalty ratio does not come anywhere near a level of constitutional concern. Plaintiffs' Eighth Amendment claims will be dismissed.

### C. The Fourth Amendment Claim

Defendants' argue that the Fourth Amendment does not apply to the type of civil forfeiture at issue here, such that Plaintiffs' Fourth Amendment claims must be dismissed. (Defs.' Mot. 39-41.) The Supreme Court has consistently applied the Fourth Amendment where the government seizes or seeks forfeiture in satisfaction of a fine or debt owed to the government. *See e.g. U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 49 (1993); *G.M. Leasing Corp. v. U.S.*, 429 U.S. 338, 352 n.18 (1977). In tax cases, where the government is acting to collect revenue, the Court has noted that the Fifth Amendment due process and the Fourth Amendment reasonableness analyses both apply and largely overlap. *G.M. Leasing*, 429 U.S. at 352 n.18 ("These cases, of course, center upon the Due Process Clause rather than the Fourth Amendment, but the constitutional analysis is similar and yields a like result.") Contrary to Defendants' argument, the fact that the Michigan legislature granted seizure authority is inapposite. (Defs.' Mot. 40). The question is whether that grant (and thus the UIA's action) comply with the due process and reasonableness standards of the Constitution. Defendants, in their motion to dismiss, do not challenge the factual, substantive arguments advanced by Plaintiffs for why UIA's fraud determination system offends the Fourth and Fifth Amendments of the Constitution. Because the Fourth Amendment does govern the

31

seizure of property in satisfaction of a debt owed to the government, dismissal of these claims, at this stage of litigation, would not be appropriate.

### D. Claims Under The Social Security Act

Defendants assert that Plaintiffs' claims under the Social Security Act must be dismissed because the Act does not create a private right of action enforceable in a § 1983 suit. (Defs.' Mot. 41.) The Supreme Court has held "that it is only violations of *rights*, not *laws*, which give rise to § 1983 actions." *Gonzaga v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original) (citing *Blessing*, 520 U.S. 329, 340 (1997)). "[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that my be enforced . . . ." *Id.* at 274 (emphasis in original). Such a right must be "unambiguously conferred." *Id.* In *Blessing*, the Supreme Court outlined a three factor approach to determining whether a statute creates a federally protected right that is enforceable against the states:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory terms.

520 U.S. at 340-41.

However, the Supreme Court has already recognized that § 303(a)(1) of the Social Security Act does create an enforceable right, *Cal. Dep't of Human Res. Dev. v. Java*, 402 U.S. 121 (1971), and this court is no position to reconsider this question of law. The Court mandates that when "precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [inferior court] should follow the case which directly controls, leaving to

th[e Supreme] Court the prerogative of overruling its own decisions." *Tenet v. Doe*, 544 U.S. 1, 10-11 (2005) (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *U.S. v. Hill*, 440 F.3d 292, 299 n.3 (2006). This admonition is directly applicable to the instant case. In *Java*, the Court entertained an action under § 303(a)(1) brought by a class of claimants and enjoined the enforcement of a state statute that the Court held violated the "when due" provision of that section. Though *Gonzaga* and *Blessing* came after the *Java* decision and raise the bar for finding an enforceable private right, the Supreme Court has not overruled *Java*. While it does appear doubtful that, applying the *Blessing* standard, § 303(a)(1) would be found to create an enforceable right, this court must "leav[e] to th[e Supreme] Court the prerogative of overruling its own decisions." *Tenet*, 544 U.S. at 11; *see also Gann v. Richardson*, 43 F. Supp. 3d 896 (S.D. Ind. 2014) (holding the same concerning § 303(a)(1)). Therefore, the court will not dismiss Plaintiffs § 1983 claims arising under the "when due" provision of the Social Security Act.

### IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendant's Motion to Dismiss (Dkt. # 10) is GRANTED as to Plaintiffs' Eighth Amendment claim and DENIED as to all other claims.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 29, 2016

33

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 29, 2016, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522